OPINION
Appellant, Kazak Brothers, Inc., d.b.a. as AA House Movers ("Kazak Brothers"), appeals from a final judgment of the Lake County Court of Common Pleas entered after a jury returned a verdict in favor of appellee, Huffman Equipment Rental and Contracting, Inc. ("Huffman Equipment"), in the amount of $75,000.
The following facts are relevant to this appeal. Michael T. Huffman ("Huffman") and Frank Cichon ("Cichon") purchased the Albracht Mansion from the city of Eastlake in 1994. The two men then formed a partnership, M F Construction ("M F"), to move, renovate, and eventually sell the home. To accomplish this, M F hired Huffman Equipment, a company solely owned by Huffman, to act as the general contractor on the project.
In its capacity as general contractor, Huffman Equipment contacted Kazak Brothers and asked the company to provide a quote for the cost of moving the mansion from its original location across Lakeshore Boulevard to a new site. Kazak Brothers complied with Huffman Equipment's request, and the parties executed a written agreement on September 30, 1994, for the relocation of the building.
Under the terms of the agreement, Kazak Brothers was only responsible for moving the structure. Moreover, Kazak Brothers also provided that it would not be liable for any damage that may occur to the structure during the move. However, it was undisputed that Kazak Brothers offered Huffman Equipment a structure moving guarantee that would override, at least in part, Kazak Brothers' disclaimer of liability. Nevertheless, Huffman Equipment expressly rejected the structure moving guarantee at the time the contract was signed.
On December 2, 1994, Kazak Brothers lifted the mansion from its original foundation and began preparations for the move to the new site. However, the actual move was delayed because the new site was not ready, and because Huffman Equipment had not yet secured permission from a neighboring landowner to enter his property so that the mansion could be placed on the new foundation.
During the delay, Huffman and Cichon became "nervous" about the move. As a result, Huffman contacted Kazak Brothers to talk "about purchasing the insurance or guarantee or whatever * * *." Although the parties now disagree on whether Huffman Equipment purchased insurance or a structure moving guarantee, it is undisputed that on December 19, 1994, Huffman, through M F, issued a $3,000 check made payable to Kazak Brothers, and that Huffman typed on the memorandum line the word "Insurance." It is also undisputed that Kazak Brothers provided Huffman Equipment with a receipt for the check that contained the phrase "Structure Guarantee."
After receiving Huffman Equipment's check, Kazak Brothers contacted David Pizur Associates, Ltd. ("Pizur"), the company's insurance agent, and asked to temporarily increase the limits of its structural floater from $50,000 to $200,000. Pizur issued Kazak Brothers a binder which contained the following language: "STRUCTURAL FLOATER: FOR MIKE HOFFMAN [sic] Limit: $200,000." The binder included a $10,000 deductible, and was effective from December 19, 1994 to January 19, 1995.
Kazak Brothers moved the mansion on January 26, 1995. According to Huffman Equipment, the structure was heavily damaged during the move when it "bottomed out" as it crossed Lakeshore Boulevard. Huffman Equipment subsequently filed an insurance claim with The Travelers Insurance Company ("Travelers"). Travelers investigated the claim, and on July 25, 1995, sent Huffman Equipment a letter informing the company that coverage would not be extended.
As a result, Huffman Equipment filed a complaint naming Travelers, Pizur, and Kazak Brothers as defendants. In its complaint, Huffman Equipment alleged that both Travelers and Pizur had acted in bad faith in denying its insurance claim, and that Kazak Brothers had illegally sold insurance without a license. Huffman Equipment, however, voluntarily dismissed the complaint before the case went to trial.
On February 24, 1999, Huffman and Cichon, d.b.a. as M F, along with Huffman Equipment, filed a complaint in the Lake County Court of Common Pleas against Kazak Brothers, asserting breach of contract, negligence, and detrimental reliance. As grounds for the complaint, Huffman, Cichon, and Huffman Equipment claimed that although Huffman Equipment had purchased "a structural guarantee, pursuant to the terms of the contract, in the amount of $250,000[,]" Kazak Brothers had refused to pay for the damage to the mansion. In addition, Huffman, Cichon, and Huffman Equipment also alleged that they had detrimentally relied on Kazak Brothers' assurances that the structure would not be damaged during the move, and that Kazak Brothers had performed the work in a negligent and unprofessional manner.
Kazak Brothers filed a motion for summary judgment on November 2, 1999. In its motion, Kazak Brothers argued, inter alia, that the parties had not agreed on the purchase of a structure moving guarantee. Instead, Kazak Brothers maintained that when Huffman and Cichon voiced their concerns about the move, Huffman Equipment decided to purchase an insurance policy to cover any potential damages to the mansion. To support its argument, Kazak Brothers noted that Huffman Equipment had already sued Travelers and Pizur for their alleged bad faith in failing to pay its insurance claim, and it was only after Huffman Equipment learned that it was not entitled to coverage that it decided to sue Kazak Brothers under the theory that a structure moving guarantee actually had been purchased.
Huffman Equipment filed a brief in opposition to summary judgment on December 1, 1999. In a judgment entry dated January 4, 2000, the trial court granted summary judgment to Kazak Brothers on Huffman Equipment's detrimental reliance claim, finding that it was not timely asserted. The trial court also granted Kazak Brothers summary judgment against Huffman and Cichon, concluding that the two men did not have standing to sue because neither were a party to the contract, and they were not expressly mentioned as third-party beneficiaries. However, the court denied the remainder of Kazak Brothers' motion concerning Huffman Equipment's claims of breach of contract and negligence.
The matter proceeded to a jury trial on May 3, 2000. At the close of Huffman Equipment's case and at the close of all the evidence, Kazak Brothers moved for a directed verdict. The trial court denied both motions, and the jury ultimately returned a verdict in Huffman Equipment's favor for breach of contract and awarded the company $75,000 in damages. In addition, the jury returned a verdict in Kazak Brothers' favor with respect to Huffman Equipment's negligence claim.
On June 23, 2000, Kazak Brothers filed a motion for judgment notwithstanding the verdict, or in the alternative, a motion for new trial. In its motion, Kazak Brothers argued, among other things, that there was no evidence that it intended to sell Huffman Equipment a structure moving guarantee after the home had been lifted from its foundation, and that the evidence actually showed Huffman intended to purchase an insurance policy to cover any potential damages.
The trial court denied Kazak Brothers' motion on August 14, 2000. Kazak Brothers then filed a timely notice of appeal with this court raising the following assignments of error for our consideration:
 "[1.] The Trial Court Erred as a Matter of Law in Denying Defendant Kazak Brothers' Motions for Directed Verdict.
 "[2.] The Trial Court Erred in Denying Kazak Brothers' Motion for Judgment Notwithstanding the Verdict or, in the Alternative, Motion for New Trial.
 "[3.] The Judgment Entered Upon the Jury's Verdict in Favor of Huffman Equipment and Against Kazak Brothers in the Amount of $75,000.00 * * * on Huffman Equipment's `Breach of Structure Guarantee' Claim is Not Supported by Sufficient Evidence and Must Be Reversed.
 "[4.] The Judgment of the Trial Court * * * Upon the Jury's Verdict and Findings is Against the Manifest weight of the Evidence and Must be Reversed."
 Because appellant's first and third assignments of error are interrelated, we will consider them in a consolidated manner. Essentially, Kazak Brothers argues that the trial court erred in denying its motions for directed verdict because Huffman Equipment failed to introduce sufficient evidence at trial to justify the submission of the case to the jury, and the jury's award was not supported by sufficient evidence. For the reasons that follow, we agree.
Civ.R. 50(A)(4) provides as follows:
 "When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."
 Under this rule, a trial court may not grant a directed verdict unless the evidence, when construed in the light most favorable to the nonmoving party, leads reasonable minds to only one conclusion, and that conclusion is adverse to the nonmovant. Fleegle v. Funtime, Inc. (Sept. 30, 1999), Geauga App. No. 98-G-2158, unreported, 1999 WL 960575, at 7. Civ.R. 50(A), therefore, requires the trial court to give the nonmoving party the benefit of all reasonable inferences that may be drawn from the evidence. Broz v. Winland (1994), 68 Ohio St.3d 521, 526. When there is sufficient credible evidence to permit reasonable minds to reach different conclusions on an essential issue, the trial court must submit that issue to the jury. O'Day v. Webb (1972), 29 Ohio St.2d 215, paragraph four of the syllabus.
A motion for a directed verdict does not present a question of fact or raise factual issues; rather, it presents a question of law, even though in deciding such a motion it is necessary to review and consider the evidence. Ruta v. Breckenridge-Remy Co. (1982), 69 Ohio St.2d 66, paragraph one of the syllabus. A motion for a directed verdict tests the legal sufficiency of the evidence, not the weight of the evidence or the credibility of witnesses. Osler v. Lorain (1986), 28 Ohio St.3d 345,347. Because a motion for a directed verdict presents a question of law, an appellate court must conduct a de novo review of the trial court's judgment. Nichols v. Hanzel (1996), 110 Ohio App.3d 591, 599.
In the instant case, Kazak Brothers puts forth the following four reasons as to why the trial court should have granted its motions for directed verdict: (1) Huffman Equipment failed to provide evidence that the parties had agreed to the purchase of a structure moving guarantee; (2) the terms of the alleged agreement were not sufficiently specific to satisfy the basic elements of a contract; (3) Huffman Equipment, as the general contractor, did not have standing to recover the costs paid by the project owner; and (4) a general contractor cannot establish standing to recover costs paid by the project owner simply by claiming that it had borrowed the money from the project owner.
In order to be successful on a breach of contract claim, the plaintiff must provide evidence of the following: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damages. Doner v. Snapp (1994), 98 Ohio App.3d 597, 600. Accordingly, the first issue this court must decide is whether the parties in the instant matter entered into an enforceable contract.
To have a valid and enforceable contract there must be an offer by one party and an acceptance of the offer by another. Camastro v. Motel 6Operating, L.P. (Apr. 27, 2001) Trumbull App. No. 2000-T-0053, unreported, 2001 Ohio App. LEXIS 1936, at 8-9. In turn, "for there to be a proper offer and acceptance, parties to a negotiation must have a meeting of the minds." Gall v. Trumbull Mem. Hosp. (July 7, 2000), Trumbull App. No. 99-T-0102, unreported, 2000 Ohio App. LEXIS 3053, at 7. Stated differently, when entering into a contract, "parties must have a distinct and common intention which is communicated by each party to the other." McCarthy, Lebit, Crystal Haiman Co., L.P.A. v. First UnionMgt., Inc. (1993), 87 Ohio App.3d 613, 620. Therefore, "[i]f the minds of the parties have not met, no contract is formed." Id.
The party claiming that there was a meeting of the minds may show this by "`the surrounding circumstances which make it inferable that the contract exists as a matter of tacit understanding.'" Gall at 8, quotingBiddle v. Warren Gen. Hosp. (Mar. 27, 1998), Trumbull App. No. 96-T-5582, unreported, 1998 Ohio App. LEXIS 1273. However, courts should only consider objective manifestations of intent when determining whether the parties had a meeting of the minds in a particular case. Nilavar v.Osborn (1998), 127 Ohio App.3d 1, 12.
In addition to a meeting of the minds, a contract must also be definite and certain with respect to its essential terms. Episcopal RetirementHomes, Inc. v. Ohio Dept. of Indus. Relations (1991), 61 Ohio St.3d 366,369. Essential terms include such things as the identity of the parties to the contract, the subject matter of the contract, and consideration.McMillian v. Haueter (Apr. 30, 1999), Geauga App. Nos. 98-G-2124 and 98-G-2125, unreported, 1999 Ohio App. LEXIS 2019, at 11, quoting Alligoodv. Proctor Gamble Co. (1991), 72 Ohio App.3d 309, 311-312.
"[T]he terms of a contract are sufficiently certain if they `provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Nilavar at 13, quoting Mr. Mark Corp. v. Rush,Inc. (1983), 11 Ohio App.3d 167, 169. Furthermore, "if the court can determine that the parties intended to be bound, it may fashion those less essential terms that were omitted in order to reach a fair and just result." Gurich v. Janson (Nov. 17, 2000), Ashtabula App. No. 99-A-0006, unreported, 2000 Ohio App. LEXIS 5369, at 12. However, as the Supreme Court of Ohio observed in Litsinger Sign Co., Inc. v. Am. SignCo. (1967), 11 Ohio St.2d 1, 14:
 "It is settled law that if the parties' manifestations taken together as making up the contract, when reasonably interpreted in the light of all the circumstances, do not enable the court to determine what the agreement is and to enforce it without, in effect, `making a contract for the parties,' no enforceable obligation results."
 As we noted earlier, Kazak Brothers argues that Huffman Equipment did not introduce any evidence showing that the parties had a meeting of the minds with respect to the purchase of a structure moving guarantee. According to Kazak Brothers, after the mansion was lifted from its foundation, Huffman and Cichon became "nervous" about moving the home. As a result, Kazak Brothers claims that Huffman Equipment agreed to purchase an insurance policy that would cover any damage that may be incurred while the structure was in transit. To accomplish this, Kazak Brothers agreed to and actually purchased a binder, purportedly on Huffman Equipment's behalf, through its insurance agent, Pizur.
Huffman Equipment, on the other hand, maintains that although it initially had declined to purchase the structure moving guarantee, the parties later orally amended their contract to include it. In support, Huffman Equipment introduced at trial a receipt from Kazak Brothers that included the phrase "Structure Guarantee" on its face.
After reviewing the record in the case at bar, this court concludes that there was no competent, credible evidence introduced demonstrating that there was ever a meeting of the minds between the parties concerning the purchase of a structure moving guarantee. In fact, a close review of the testimony actually shows that Huffman, Huffman Equipment's sole owner, was himself confused on this issue.
For example, when explaining why he changed his mind about purchasing "the insurance or guarantee or whatever[,]" Huffman testified that he was told by Kazak Brothers "it wouldn't be a problem * * * and we could obtain insurance * * * through their company." Furthermore, when asked what he thought Kazak Brothers was going to then do, Huffman stated:
 "I was under the impression from John that they were going to purchase a policy for the moving of the building through the company that they normally use that ensures this type of thing, because I didn't know where to go to get insurance on something of this nature because it's not a normal thing to move a house. It's not done every day."[1]
 In fact, when Huffman discovered that the binder showed Kazak Brothers actually had "added insurance onto their [sic] own policy and they never bought [Huffman Equipment] an insurance policy[,]" he believed that he had been lied to by Kazak Brothers. To emphasize that point, Huffman Equipment's attorney asked Huffman the following question:
 "Q. For a while you actually thought they bought you insurance?
 "A. Correct. That's what I was told was going to happen."
 After the house was moved, Huffman testified that he examined the mansion and discovered significant damage had occurred. As a result, he contacted Kazak Brothers and suggested that they "ought to call the insurance company." Huffman claimed that someone in Kazak Brothers' office told him "`[d]on't do anything until [the mansion is] on it's [sic] * * * new foundation.'" When the house did not "come back" after being positioned, Huffman once more called Kazak Brothers to ask what to do. It was at that time, according to Huffman, he was told to "contact Travelers Insurance Company," who later sent an adjuster to the site.
On redirect examination, Huffman was asked to explain why he thought he had insurance at this time. He responded:
 "Um, because that's what you have. John Kazak told us, and I thought at the time of the deposition until `97, I found out different after several attempts trying to find out what they really did with the $3,000 we gave them for the guarantee."
 Later in the proceedings, Huffman Equipment's attorney asked Huffman to explain why the original lawsuit against Travelers, Pizur, and Kazak Brothers had been dismissed. Huffman told the jury that the complaint had been dismissed "[b]ecause originally we had filed it against Traveler's [sic] Insurance and found out after Equipment Rental didn't have insurance like we originally thought like Kazak had, so we refiled."
Based on the foregoing testimony, it is quite clear that the parties never had a meeting of the minds concerning the purchase of a structure moving guarantee. Not only does Kazak Brothers deny it ever offered Huffman Equipment that option after it originally had been rejected, but Huffman himself thought that Kazak Brothers had purchased insurance on Huffman Equipment's behalf. In fact, Huffman Equipment asked for and received a copy of the binder that was issued to Kazak Brothers, submitted a claim to Travelers for the damage, and even sued the insurance company and its agent when its claim was denied. It was only after Huffman Equipment learned that the binder had expired before the mansion was moved, and that there was, as a result, no coverage, did Huffman Equipment file a complaint alleging that Kazak Brothers had breached their contract by failing to honor a structure moving guarantee, despite the fact that Huffman Equipment never made a claim under the alleged guarantee.[2]
Moreover, even if the parties had reached a meeting of the minds to obtain insurance coverage, the contract would still be unenforceable because it was not specific as to its essential terms. Huffman Equipment claims that on December 19, 1994, the parties agreed to orally modify their original written agreement to include the structure moving guarantee. However, Huffman conceded at trial that the parties did not reduce this modification to writing, although the parties' agreement clearly stated that "[a]ny deviations from * * * specifications * * * will be executed only upon written orders[,]" and that the only documentation of their agreement was the receipt given by Kazak Brothers.
Generally speaking, a written contract may be orally amended. However, an oral amendment will be valid only if it has the essential elements of a binding contract. Carrocce v. Shaffer (Oct. 31, 1997), Trumbull App. No. 96-T-5521, unreported, 1997 Ohio App. LEXIS 4845, at 9.
As we noted earlier, "the terms of a contract are sufficiently certain if they `provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Nilavar at 13. Here, while one may infer from the record what would constitute a breach, there is, at the same time, nothing in the record that would allow a trier of fact to "fashion those less essential terms that were omitted in order to reach a fair and just result[,]" Gurich at 12, concerning an appropriate remedy.
For example, at one point during the trial, Huffman claimed that the structure moving guarantee agreed to by the parties had a $250,000 liability limitation, while at other times he claimed that the guarantee was unlimited. Nevertheless, even if these inconsistencies did not exist, Huffman Equipment failed to introduce any evidence to substantiate either claim.
Huffman Equipment's failure to do so is important in light of the structure moving guarantee typically included in contracts drafted by Kazak Brothers. This guarantee provides that the owner of a structure being relocated may obtain a $25,000 guarantee, with a $1,000 deductible, for an additional $800. The guarantee may be increased at a cost of $20 per $1,000 of additional coverage. Nowhere is there an option to purchase an unlimited guarantee.
The receipt Huffman Equipment relies on is just that, a receipt. While it might arguably be some evidence of the parties' intent, it is not, by itself, sufficient to establish a binding contract, particularly in light of Huffman's typing the word "Insurance" on the check issued to Kazak Brothers.[3]
Huffman, however, claims that he thought he was purchasing a "structural guarantee," while Kazak Brothers, who used the term "structure guarantee" on the receipt, maintains that Huffman Equipment purchased insurance. This evidence simply shows that both parties, at best, were confused as to what the transaction at issue really involved.
The jury also appeared to be confused because in the interrogatories submitted by the parties, it found that Huffman Equipment had purchased $134,000 in coverage, minus the $1000 deductible, under a structure moving guarantee. They evidently reached this result by taking the payment terms of the originally rejected structure moving guarantee and applying them to the $3000 given to Kazak Brothers. In other words, the jury apparently assumed that Huffman Equipment meant to purchase the basic $25,000 in coverage for $800, plus an additional $110,000 at $20 per $1000 unit. As discussed above, there is absolutely no evidence in the record to support this conclusion.
To support its breach of contract claim, Huffman Equipment was obligated to first show that the parties had an enforceable contract, which it failed to do. Instead, the record clearly demonstrates that the parties never reached a meeting of the minds, and even if they had, the terms of the contract were not specific enough to allow for enforcement.
Accordingly, the trial court should have granted Kazak Brothers' motions for directed verdict because the evidence, when construed in the light most favorable to Huffman Equipment, could lead reasonable minds to only one conclusion, and that conclusion, as a matter of law, is adverse to Huffman Equipment. Kazak Brothers' first and third assignments of error have merit.
In view of this court's determination that there was no valid contract between the parties, Kazak Brothers' remaining assignments of error are moot. The judgment of the trial court, is reversed, and the matter is remanded so that the trial court can enter judgment in favor of Kazak Brothers.
FORD, P.J., concurs, GRENDELL, J., dissents with Dissenting Opinion.
[1] A portion of Huffman's deposition was introduced at trial in which he made similar comments:
 "Actually, I thought we were buying insurance, it was just their company, his insurance company that was doing it because they're familiar with the type of work. I thought we bought a policy ourselves."
[2] Under the terms of the structure moving guarantee originally offered, all "claims must be made not later than thirty days following the lowering of structure on to new foundation." Furthermore, Kazak Brothers also required that all claims be made in writing, and the company reserved the right to repair any damage itself.
[3] Kazak Brothers provided testimony that the inclusion of the phrase "structure guarantee" on the receipt was a mistake created by the company's computer system, which did not have an inventory code for obtaining insurance on a customer's behalf.